UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| SCOTT AND GINA RUDY LIVING TRUST DATED MARCH 18, 2011, on Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>PANERA BREAD COMPANY, RONALD SHAICH, WILLIAM W. MORETON, DOMENIC COLASACCO, LARRY FRANKLIN, FRED FOULKES, THOMAS E. LYNCH, DIANE HESSAN, MARK STOEVER, and JAMES WHITE,<br><br>Defendants. | Case No.<br><br><br><br><br><br><br><br>JURY TRIAL DEMANDED |

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff Scott and Gina Rudy Living Trust dated March 18, 2011 ("Plaintiff"), through its undersigned counsel, alleges upon personal knowledge with respect to itself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1. This is a stockholder class action brought by Plaintiff on behalf of itself and the other public stockholders of Panera Bread Company ("Panera" or the "Company") (other than Defendants outlined below) against the Company and its Board of Directors (the "Board" or "Director Defendants") in connection with the April 4, 2017 entry by Panera into a definitive merger agreement (the "Merger Agreement") with JAB Holdings B.V. ("JAB"), Rye Parent Corp. ("Parent"), and Rye Merger Sub, Inc. ("Merger Sub"). Pursuant to the Merger Agreement, Merger Sub will merge with and into the Company, with the Company continuing as the surviving

corporation and direct wholly-owned subsidiary of JAB (the "Proposed Transaction"). Under the terms of the Merger Agreement, each share of Panera's common stock will be converted into the right to receive $315.00 in cash (the "Merger Consideration").

2.   In order to convince Panera's stockholders to vote in favor of the Proposed Transaction, the Director Defendants authorized the filing of a misleading Form PREM 14A (the "Proxy") with the Securities and Exchange Commission on or about May 12, 2017 in violation of Sections 14(a) and 20(a) of the Exchange Act. The Proxy contains incomplete and materially misleading information regarding: (i) the process that resulted in the Proposed Transaction and the conflicts of interest infecting it, (ii) the financial analysis conducted by the Company's financial advisor, Morgan Stanley & Co. LLC ("Morgan Stanley"), and (iii) the projections used by Morgan Stanley in those analyses.

3.   For these reasons and as set forth in detail herein, Plaintiff asserts claims against Panera and the Director Defendants for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S,C. §§78n(a), 78t(a), and United States Securities and Exchange Commission ("SEC") Rule 14a-9). Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Panera stockholders before the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Defendants' violations of the Exchange Act.

**JURISDICTION AND VENUE**

4.   This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder and Section 20(a) of the Exchange Act.

5. Personal jurisdiction exists over each Defendant either because the Defendant is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

6. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Panera maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

**A.    Plaintiff**

7. Plaintiff is, and at all relevant times was, a continuous shareholder of Panera.

**B.    Defendants**

8. Defendant Panera Bread Company (previously defined as "Panera"), is a corporation organized and existing under the laws of the State of Delaware with its principal executive offices located at 3630 South Geyer Road., Suite 100, St. Louis, Missouri, 63127.

9. Defendant Ronald M. Shaich ("Shaich") serves as the Company's founder, Chairman of the Board, and Chief Executive Officer ("CEO") and has served as a director of the Company since 1981.

10. Defendant William W. Moreton ("Moreton") has served as the Company's Executive Vice Chairman since August 2013, and as a member of the Board since May 2010.

11. Defendant Domenic Colasacco ("Colasacco") has served as a director of the Company since March 2000 and as its Lead Independent Director since January 2008.

12. Defendant Larry Franklin ("Franklin") has served as a director of the Company since June 2001.

13. Defendant Fred Foulkes ("Foulkes") has served as a director of the Company since June 2003.

14. Defendant Thomas E. Lynch ("Lynch") has served as a director of the Company since March 2010.

15. Defendant Diane Hessan ("Hessan") has served as a director of the Company since November 2012.

16. Defendant Mark Stoever ("Stoever") has served as a director of the Company since January 2016.

17. Defendant James White ("White") has served as a director of the Company since January 2016.

18. Defendants Shaich, Moreton, Colasacco, Frankln, Foulkes, Lynch, Hessan, Stoever, and White, form the Board of Directors of Panera and are collectively referred to herein as the "Board" or the "Director Defendants." Each of the Director Defendants at all relevant times had the power to control and direct Panera to engage in the misconduct alleged herein.

19. Defendants Panera and the Director Defendants are collectively referred to as the "Defendants."

## CLASS ACTION ALLEGATIONS

20. Plaintiff brings this Action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of itself and the other public stockholders of Panera (the "Class"). Excluded from the Class are

Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

21. This action is properly maintainable as a class action.

22. The Class is so numerous that joinder of all members is impracticable. As of March 15, 2017, there were approximately 22,751,221 outstanding shares of Panera common stock. The actual number of public shareholders of Panera will be ascertained through discovery.

23. Questions of law and fact are common to the Class, including, among others:

   a. Whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction from the Proxy in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

   b. Whether the Director Defendants have violated Section 20(a) of the Exchange Act; and

   c. Whether Plaintiff and other members of the Class will suffer irreparable harm if the Proposed Transaction is consummated as presently anticipated.

24. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

25. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

26.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

**A.     Corporate Background**

27.     Panera is a national food service company known for its bakery-café concept. The Company operates through three segments: Company baker-café operations, franchise operations, and fresh dough and other product operations. As of late 2016, the Company operated 2,036 own and franchise-operated bakery-café locations under the Panera Bread, Saint Louis Bread Co., and Paradise Bakery & Café brands.

**B.     The Process Leading to the Proposed Transaction**

28.     The Proposed Transaction is the result of a brief, flawed, single-bidder "process" led almost exclusively by Defendant Shaich – the most conflicted member of Panera's Board – and under the pressure of pre-merger media speculation.

29.     More specifically, on several occasions beginning in August 2016, Defendant Shaich discussed a potential strategic collaboration between Panera and a counterparty defined as Party A in the Proxy. However, Party A ultimately declined to move forward with a business combination in light of Panera's then-current stock trading price.

30.     Several months later, in February 2017, Defendant Shaich began discussing a business combination between the Company and JAB with Olivier Goudet, the CEO of JAB, and David Bell, Head of M&A of JAB. On March 10, 2017, JAB made an initial offer for JAB to acquire the Company at a price of $286.00 per share in cash. As part of this offer, though, JAB noted that it would withdraw its proposal if Panera contacted any third parties in an attempt to generate competing interest in an acquisition of Panera.

31. On March 14, 2017, the Board instructed Defendant Shaich to pursue further discussions with Messrs. Goudet and Bell along these lines, but to seek more consideration. On March 20, 2017, JAB informed Defendant Shaich that JAB was prepared to make an offer of $296.50 per share in cash for the Company.

32. On March 25, 2017, Mr. Bell discussed with Defendant Shaich the potential timing for entering into a definitive agreement, and requested that the Company accelerate the timeline of the transaction by a week, with a proposed announcement on or about April 3, 2017.

33. On March 26, 2017, the Company and JAB Forest B.V., an affiliate of JAB, executed a confidentiality agreement. Later that day, Defendant Shaich and Messrs. Goudet and Bell agreed to work towards entering into a definitive agreement during the week of April 3, 2017.

34. On March 27, 2017, the Company and JAB learned that a Bloomberg reporter was seeking comment from various people regarding a potential acquisition of the Company.

35. From March 28, 2017 until the execution of the Merger Agreement on April 4, 2016, barely a week later, the parties and their respective legal and financial advisors exchanged several drafts of, and engaged in numerous discussions and negotiations concerning the terms of, the merger agreement and Defendant Shaich's voting agreement.

36. On March 30, 2017, representatives of Morgan Stanley reviewed with the Board preliminary value implications of the revised offer of $296.50 per share and relative comparisons to valuations of certain precedent transactions in the sector. At this time, Morgan Stanley also disclosed its prior engagements with affiliates of JAB.

37. On March 31, 2017, Defendant Shaich, Blaine Hurst, President of the Company, Defendant Moreton, and Michael J. Bufano, Senior Vice President and Chief Financial Officer of the Company, made a presentation to representatives of JAB regarding the Company, including financial information and projections.

38. On April 3, 2017, Bloomberg reported that Panera was exploring strategic options, including a possible sale. Following this report, the Company's stock price closed 8% higher, creating significant pressure to execute sale so as to avoid any corresponding drop. On the same day, JAB communicated to the Company its "best and final offer" of $315.00 per Company share in cash.

39. On the morning of April 4, 2017, at a meeting of the Board, Morgan Stanley reviewed with the Board the financial analyses performed by Morgan Stanley in connection with the potential transaction, highlighting key valuation methods and financial metrics that had been relied upon by the financial advisor in rendering its fairness opinion. Later that same day, the Company and Parent, Merger Sub and JAB executed the merger agreement. Also on April 4, 2017, Defendant Shaich and his affiliates and Parent and Merger Sub executed a voting agreement, pursuant to which approximately 15.5% of the Company's voting power is locked up in favor of the Proposed Transaction. Notably, in connection with the consummation of the Proposed Transaction, Defendant Shaich is expected to receive more than $28 million in insider benefits not shared with the Company's public, non-insider shareholders.

C. **The Proposed Transaction**

40. On April 5, 2017, Panera and JAB issued a press release jointly announcing the Proposed Transaction, which provides in pertinent part:

**Panera Bread and JAB Announce Definitive Merger Agreement**

*Panera Shareholders to Receive $315 Per Share in Cash in $7.5 Billion Transaction*

**St. Louis, MO — APRIL 5, 2017** — Panera Bread Company ("Panera" or the "Company") (NASDAQ: PNRA) and JAB today announced that the companies have entered into a definitive merger agreement under which JAB will acquire Panera for $315 per share in cash, in a transaction valued at approximately $7.5 billion, including the assumption of approximately $340 million of net debt. The agreement, which has been unanimously approved by Panera's Board of Directors, represents a premium of approximately 30% to the 30-day volume-weighted average stock price as of March 31, 2017, the last trading day prior to news reports

speculating about a potential transaction, and a premium of approximately 20% to Panera's all-time high closing stock price as of that same date.

**Comment by Panera Founder, Chairman and CEO**

Ron Shaich, Founder, Chairman and CEO of Panera, commented, "By any measure, Panera has been one of the most successful restaurant companies in history. What started as one 400 square foot cookie store in Boston has grown to a system with over 2,000 units, approximately $5 billion in sales, and over 100,000 associates. In more than 25 years as a publicly traded company, Panera has created significant shareholder value. Indeed, Panera has been the best performing restaurant stock of the past twenty years – up over 8,000%. Today's transaction is a direct reflection of those efforts, and delivers substantial additional value for our shareholders."

Shaich continued, "Over the last five years, we have developed and executed a powerful strategic plan to be a better competitive alternative with emerging runways for growth. The themes we have bet on - digital, wellness, loyalty, omni-channel, new formats for growth - are shaping the restaurant industry today. Indeed, the power of the plan is evident in our business results. Today, we are pre-releasing Q1 2017 Company-owned bakery-cafe comps of 5.3%, which is 690 bps better than the Black Box all-industry composite."

Shaich concluded, "Our success for shareholders is the byproduct of our commitment to long-term decision making and operating in the interest of all stakeholders, including guests, associates, and franchisees. We believe this transaction with JAB offers the best way to continue to operate with this approach. We are pleased to join with JAB, a private investor with an equally long-term perspective, as well as a deep commitment to our strategic plan."

**Comment by JAB Partner and CEO**

Olivier Goudet, JAB Partner and CEO, said, "We have long admired Ron and the incredible success story he has created at Panera. I have great respect for the strong business that he, together with his management team, its franchisees and its associates, has built. We strongly support Panera's vision for the future, strategic initiatives, culture of innovation, and balanced company versus franchise store mix. We are excited to invest in and work together with the Company's management team and franchisees to continue to lead the industry."

**Company Pre-Announces Comparable Net Bakery-Cafe Sales Growth for Company-owned Bakery Cafes**

In fiscal Q1 2017, Company-owned comparable net bakery-cafe sales increased 5.3% compared to the same period in fiscal 2016. Two-year Company-owned comparable net bakery-cafe sales increased 11.5%. Additionally, Company-owned comparable net bakery-cafe sales in fiscal Q1 2017 outperformed the Black Box all-industry composite by 690 basis points.

**Transaction Details**

The transaction is not subject to a financing condition and is expected to close during the third quarter of 2017, subject to the approval of Panera shareholders and the satisfaction of customary closing conditions, including applicable regulatory approvals.

Mr. Shaich has entered into a voting agreement whereby he and entities affiliated with him have agreed to vote shares representing approximately 15.5% of the Company's voting power in favor of the transaction. Following the close of the transaction, Panera will be privately held and continue to be operated independently by the Company's management team.

JAB is acquiring Panera through JAB BV, an investment vehicle of JAB Consumer Fund and JAB Holding Company. JAB Consumer Fund is backed by a group of like-minded, long-term oriented investors and, together with JAB Holding Company, invests in companies with premium brands, attractive growth and strong margin dynamics in the Consumer Goods category. Both JAB Holding Company and JAB Consumer Fund are overseen by three senior partners, Peter Harf, Bart Becht and Olivier Goudet. Entities affiliated with BDT Capital Partners are also investing alongside JAB BV.

**Advisors**

Morgan Stanley & Co. LLC is serving as financial advisor to Panera in connection with this transaction and Sullivan & Cromwell, LLP is serving as legal counsel.

**D.     The Defendants Are Withholding Material Information from Shareholders.**

41.     Finally, on May 12, 2017, the Director Defendants authorized the filing of the Proxy with the SEC in connection with the Proposed Transaction in order to convince Panera's stockholders to vote in favor of the Merger.  As discussed below and elsewhere herein, the Proxy omits and/or misrepresents material information that must be disclosed to Panera's stockholders to enable them to render an informed decision with respect to the Proposed Transaction.

42.     First, the Proxy fails to fully and fairly disclose certain material information concerning the background of the Proposed Transaction. Specifically, the Proxy fails to adequately disclose:

   a.  Whether the Board determined that a superior alternative transaction was unlikely, and if so, how and why that determination was made. This information is especially material given that that the Board did not conduct a pre-signing market check and the Merger Agreement does not provide for a post-signing market check;

   b.  The nature of any post-close opportunities offered to or otherwise made available to members of the Board or Company management, including the amount of equity

in the combined company that may be made available to them, and the circumstances surrounding the negotiation of the same, including the timing thereof; and

c.  Whether Defendant Shaich or Defendant Moreton informed other members of the Board of JAB's March 25, 2017 request to accelerate the timing for entering into a definitive agreement.

43.  Second, the Registration Statement fails to disclose material key inputs and assumptions underlying the analyses conducted by Morgan Stanley.

a.  Specifically, in connection with Morgan Stanley's *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose specific line items used to both calculate the unlevered free cash flow figure used in the analysis and to adjust the outcome thereof, including tax-affected earnings before interest and taxes and after stock-based compensation expense, depreciation, amortization, capital expenditures, cash flow from investing activities, changes in working capital, after-tax one-time items, estimated total debt, estimated non-controlling interest and cash, estimated cash equivalents, and estimated marketable securities.

b.  In addition, in its *Selected Comparable Trading Analysis*, *Discounted Equity Value Analysis*, and *Discounted Cash Flow Analysis*, Morgan Stanley relied on two sets of projections, which the Proxy identified as "the Street Consensus Case" and the "Management Five-Year Plan." But the Proxy discloses only the Management Five-Year Plan, and fails to disclose the Street Consensus Case at all.

44.  Finally, the Proxy provides certain management projections, but only provides non-GAAP metrics for a number of key projection line items. This decision makes it almost impossible for shareholders to assess the free cash flow figures used or the analyses based on them, as

companies can treat non-cash items differently in calculating non-GAAP financial measures like this. The Company is required to provide a reconciliation of these non-GAAP metrics to GAAP metrics, and its failure to do so renders the Proxy materially misleading and in violation of Rule 14a-9 and SEC Regulation G, 17 C.F.R. 244.100.[1]

45. The Proxy is materially incomplete and misleading because it omits the information identified above. Defendants, separately and together, in connection with the Proposed Transaction are knowingly or recklessly violating their fiduciary duties, including their duties of loyalty and due care owed to Plaintiff and other public stockholders of Panera.

## COUNT I

### On Behalf of Plaintiff and the Class Against
### Panera and the Director Defendants for Violations of Section 14(a)

---

[1] SEC Regulation G has two requirements: (1) a general disclosure requirement and (2) a reconciliation requirement. The general disclosure requirement prohibits "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure...not misleading." 17 C.F.R. § 244.100(b). The reconciliation requirement requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure. 17 C.F.R. § 244.100(a).

Indeed, in recent months, the SEC has specifically begun to crack down on the widespread use of such non-GAAP financial measures in shareholder communications because such measures lack consistent definitions and are often inherently misleading. Mary Jo White, Chair of the SEC, specifically raised the issue in a June 27, 2016 keynote address, during which she stated:

> [O]ur rules governing these communications make clear that **the presentation of non-GAAP measures cannot be misleading and require that they be reconciled to the appropriate GAAP measure** so that investors and analysts can compare them to the one that is consistently defined under the GAAP requirements . . . . In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation . . . . [L]ast month, the staff issued guidance addressing a number of troublesome practices which can make non-GAAP disclosures misleading: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.

*Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html.

**of the Securities Exchange Act of 1934 and Rule 14a-9 Promulgated Thereunder**

46.  Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

47.  Defendants have issued the Proxy with the intention of soliciting stockholder support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, among other things, the process that led to the Proposed Transaction and the key inputs and assumptions of the financial analysis performed by Morgan Stanley in support of its fairness opinion.

48.  In so doing, defendants made untrue statements of fact and omitted state material facts necessary to make the statements made not misleading.  Each of the Director Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

49.  SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any 14D9 statement, form of 14D9, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a 14D9 for the same meeting or subject matter which has become false or misleading.

50.  During the relevant period, Defendants disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

51.  Specifically, and as detailed above, the Proxy violates Section 14(a) and Rule 14a-

9 because it omits material facts concerning certain material information regarding the process leading up to the consummation of the Merger Agreement, key inputs and assumptions underlying Morgan Stanley's financial analysis, and the projections used by Morgan Stanley in that analysis.

52. Moreover, in the exercise of reasonable care, the Director Defendants knew or should have known that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Director Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that Morgan Stanley reviewed its financial analysis with the Board and that the Board considered the financial analysis provided by Morgan Stanley in its fairness opinion. The Director Defendants knew or should have known that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

53. The omissions and false and misleading statements in the Proxy are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

54. By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.

55. Unless Defendants are enjoined by the Court, they will continue to breach their duties owed to Plaintiff and the members of the Class, to the irreparable harm of the members of the Class.

56. Because of the false and misleading statements in the Proxy, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive

relief is appropriate to ensure the Director Defendants' misconduct is corrected.

## COUNT II

**On Behalf of Plaintiff and the Class Against the Director Defendants
for Violations of Section 20(a) of the Securities Exchange Act of 1934**

57.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

58.     The Director Defendants acted as controlling persons of Panera within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Panera, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

59.     Each of the Director Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

60.     In particular, each of the Director Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Director Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of this document.

61.     In addition, as the Proxy sets forth at length, and as described herein, the Director

Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Director Defendants reviewed and considered. The Director Defendants participated in drafting and/or gave their input on the content of those descriptions.

62. By virtue of the foregoing, the Director Defendants have violated Section 20(a) of the Exchange Act.

63. As set forth above, the Director Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Director Defendants' conduct, Plaintiff will be irreparably harmed.

64. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict. Because of the false and misleading statements in the Proxy, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure the Director Defendants' misconduct is corrected.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representatives and Plaintiff's counsel as Class counsel;

B. Enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C. In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D. Directing Defendants to account to Plaintiff and the Class for damages sustained because of the wrongs complained of herein;

E. Awarding Plaintiff, the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

June 7, 2017                                             Respectfully submitted,


**CAREY DANIS & LOWE**

/s/ James J. Rosemergy_____
James J. Rosemergy MO#50166
8235 Forsyth, Suite 1100
St. Louis, MO 63105
Telephone: (314) 725-7700
Facsimile: (314)721-0905
Email: jrosemergy@careydanis.com

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde  (#8169CA)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
jmonteverde@monteverdelaw.com